O

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

|  |  |
|---|---|
| GARRICK PIETRO,<br><br>        Plaintiff,<br><br>    vs.<br><br>THE WALT DISNEY COMPANY,<br><br>        Defendant. | Case No.: SACV 11-0819 DOC(JCx)<br><br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Before the Court is Motion for Summary Judgment (Dkt. 15) filed by Defendant The Walt Disney Company ("Defendant"). After considering all papers related to the Motion and oral argument, the Court GRANTS the Motion.

## I.    Background

The gravamen of Plaintiff's First Amended Complaint ("FAC") is that Defendant violated California laws by terminating Plaintiff for failing three times to notify Defendant of Plaintiff's unavailability prior to the beginning of Plaintiff's 5 a.m. shift and that Defendant did

not engage in an interactive process with Plaintiff to accommodate his prostate cancer.  *See* Notice of Removal (Dkt. 1) Ex. 1 (FAC).  Unless otherwise stated, the parties do not genuinely dispute the following facts.

### a. Defendant's No Call/No Show policy and Plaintiff's awareness of the policy

Defendant's "No Call/No Show" policy provides that employees who will not be able to work their scheduled shift must notify a scheduling representative (scheduler, manager, or administrative assistant) prior to the start of the shift.  Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶3.  If an employee fails to contact a scheduling representative prior to his shift, it will be documented as a No Call/No Show.  *Id.* at ¶4.  If an employee has three documented No Call/No Show shifts in a 12-month period, it will result in termination.  *Id.* at ¶5.  Plaintiff was reminded of the importance of the No Call/No Show policy during his "Presenteeism" training in 2005, and after his first two No Call/No Show violations.  *Id.* at ¶6.

### b. January 2, 2008: Plaintiff's first No Call/No Show

Plaintiff's first No Call/No Show violation of 2008 occurred on January 2, 2008, when Plaintiff failed to notify his scheduling representative prior to the start of his shift that he would not be able to fulfill his scheduled shift.   Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶9.

### c. February/March 2008: Plaintiff informs Defendant that Plaintiff has cancer

Plaintiff was diagnosed with prostate cancer in either February or March 2008.  *Id.* at ¶7. Plaintiff testified that he told Glenn Kieler that he had cancer "[a]lmost as soon as [Plaintiff] found out" his diagnosis.  Pietro Depo. (Dkt. 16-2) at 33:3-7 (Q: "When did you tell Mr. Kieler that you had cancer?" A: "Almost as soon as I found out.  I needed to take off some time to be operated on, and I told him I was going to need some time off."), 129:12-13 (Q: "And what did you do?" A: "I spoke to Glenn about it.").

In March 2008, Plaintiff took a planned and excused medical leave.  Opp'n at 6:4-7:18.

### d. April 14, 2008: Plaintiff's doctor's note states that Plaintiff "can return to full duties with no restrictions on 4/14/2008

Defendant received from Plaintiff's doctor a "Kaiser Permanente Visit Verification Form" that states that Plaintiff "was seen in this office" on "4/10/08" and that Plaintiff "can return to full duties with no restrictions on 4/14/2008."  Rhoads Decl. (Dkt. 18-6) at ¶2, Ex. 1.

### e.  June/July 2008: Plaintiff tells Foreman Sanchez he needs "accommodation for . . . being late or not being able to show up"

Plaintiff testified that "[s]ometime in late June or early July, 2008," he talked to his foreman, Carlos Sanchez, ("Foreman Sanchez") "about [Plaintiff's] illness, and asked if [Defendant] could provide any accommodation.'"  Pietro Decl. (Dkt. 16-3) at ¶11; Pietro Depo. (Dkt. 16-2) at 129:1-2 (Q: ". . . your condition with Carlos Sanchez?" A: "That I was sick and needed help.").  In that conversation with Foreman Sanchez, Plaintiff requested "[a]ccommodation for . . . being late or not being able to show up."  Pietro Depo. (Dkt. 16-2) at 129:4-9 (Q: "What type of help?" A: "Accommodation for . . . being late or not being able to show up." Q: "You said that to Carlos?" A: "Yeah.").

In response, Foreman Sanchez told Plaintiff that he "needed to take it up with Glenn [Kieler]." *Id.*  Glenn Kieler ("Manager Kieler") is Plaintiff's manager.  Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶7.

### f.  July 30, 2008: Plaintiff's second No Call/No Show and the impact of Plaintiff's symptoms on his ability to notify Defendant of Plaintiff's unavailability to work

Plaintiff's own testimony shows that his "symptoms did not prevent him from calling WDPR on other occasions when he experienced the same symptoms, and his wife could have called WDPR on his behalf."  Def.'s Stmt Uncontroverted Facts (Dkt. 15-2) at ¶ 25; Pl. Depo. 49:17-50:5, 52:9-12 (Q: "Do you know whether or not in the past your wife has ever made any calls on your behalf to Disney because of you being sick or ill?" A: "I believe yes, she did." . . . Q: "So to the extent that you weren't able to make a phone call for yourself, your wife was certainly capable of making a call on your behalf?" A: "Yes."), 64:23-65:20, 66:3-23, 75:4-24, 78:16-79:8, Ex. 5, 137:25-140:9, 140:12-142:3, Ex. 20.  For example, Plaintiff testified that he was absent on June 25, 26, and 27, of 2008, because he was "sick" with symptoms

"[n]auseousness, going to the bathroom, problems going to the bathroom, dizziness." Pl. Depo. 78:16-79:8. These were the "same symptoms" that Plaintiff had on November 21, 2008, when Plaintiff failed to call before his 5 a.m. shift to inform Defendant that Plaintiff would not be at work. Pl. Depo. 78:16-79:8. Plaintiff's symptoms did not prevent him from moving his head side to side, bending his knees, walking, reading, moving his arms, raising his arms over his head, standing up, or calling his wife." Def.'s Stmt Uncontroverted Facts (Dkt. 15-2) at ¶ 24; Pl. Depo. 137:25-140:9.

Plaintiff attempts to dispute the facts in the previous paragraph by arguing that he was sometimes "so severely ill that he 'wasn't even aware what time it was or what day it was,'" citing his testimony regarding his failure to call Defendant prior to Plaintiff's 5 a.m. shift on July 30, 2008.[1] Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶¶ 24-25. Plaintiff testified that he "start[ed] feeling ill" on July 29, 2008. Sharif Decl. (Dkt. 16-2) at Ex 2 (Pl. Depo. 61:14-17). As of the night of July 29, 2008, Plaintiff "had an understanding" that he "wasn't gonna make it in." *Id.* at 61:23-25. Then, on the morning of July 30, 2008, he still did not feel fine:

Q: "When you woke up that morning –"

Plaintiff: "Yeah."

Q: "-- you didn't feel fine, though?"

Plaintiff: "No, I didn't. I don't even know if I woke up on time. I think I woke up - - my wife came downstairs, and she said Gary, what are you doing? It's 9:00 o'clock. I wasn't even aware what time it was or what day it was, and she said

---

[1] Plaintiff conceded as "undisputed" Defendant's Statement of Undisputed Facts that "[o]n *August 7, 2008*, Plaintiff failed to call before being absent from his shift, resulting in his second No Call/No Show violation." *See* Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶10 (emphasis added). However, the Plaintiff deposition testimony on which Defendant relied for this fact actually shows that, on *July 30, 2008*, Plaintiff failed to call before being absent from his shift, resulting in his second No Call/No Show violation. *See* Decl. Verde (Dkt. 15-4) at Ex. 1 (Pl. Depo.) at 52:13-53:19, 59:25-60:3, Depo. Ex. 4 (memorandum of August 7, 2008 meeting).

You haven't even called in to work. You better call your boss right away. So I

called in, but my shift had already started at 5:00 o'clock in the morning."

### g. August 7, 2008: Plaintiff's second No Call/No Show is recorded and Manager Kieler tells Plaintiff he needs to fill out a form if Plaintiff "needed to take off from work or was not going to be able to make it in"

There is no evidence that Plaintiff followed Foreman Sanchez's instruction for Plaintiff to speak with Kieler until Kieler met with Plaintiff regarding Plaintiff's second No Call/No Show.

On August 7, 2008, Plaintiff met with Kieler about Plaintiff's second No Call/No Show violation that occurred when he failed to call in before his shift on July 30, 2012. *See* Decl. Verde (Dkt. 15-4) at Ex. 1 (Pl. Depo.) at 52:13-53:19, 59:25-60:3, Depo. Ex. 4 (memorandum of August 7, 2008 meeting). Plaintiff testified that, in the meeting about this second violation, he "told" Manager Kieler that Plaintiff "was profus[ely] vomiting, and . . . sick" and "not feeling well." Pietro Depo. (Dkt. 16-2) at 53:25-54:1. Plaintiff never told "Kieler about any of the[] things [Plaintiff] would have liked to have done for [him]" as accommodation. *Id.* at 100:18-24 (Q: "Did you ever talk to Mr. Kieler about any of these things you would have liked to have done for you?" A: "No. No.").

Manager Kieler "told" Plaintiff that, "if [Plaintiff] needed to take off from work or was not going to be able to make it in, there was a certain form that [Plaintiff] needed to fill out, take to [Plaintiff's] doctor" and that Plaintiff "could go get that form." *Id.* at 54:6-22.

### h. Plaintiff does not fill out and return to Defendant the form specified by Kieler, nor provide Defendant with symptoms of Plaintiff's cancer that required accommodation or how he could be accommodated

Plaintiff has not identified evidence that Plaintiff filled out and returned to Defendant the form specified by Kieler. Nor has Plaintiff identified evidence that, after the August 7, 2008 meeting, he told anyone at Defendant the symptoms of his cancer that required accommodation

or how he could be accommodated.[2]  *See id.* at 100:18-24 (Q: "You never raised [any of the things you would have liked to have done for you] with [Kieler]?" A: "No." Q: "You never raised it with anybody from Disney?" A: "No.").

### i. November 21, 2008: Plaintiff's third No Call/No Show

Plaintiff was a No Call/No Show for a third time in a 12-month period on November 21, 2008.   Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶11.

### j. December 2008: Defendant terminates Plaintiff for violating No Call/No Show policy

It is undisputed that Dee McCaleb, from Defendant's Labor Relations/Human Resources group, recommended Plaintiff's termination based upon Defendant's No Call/No Show policy. Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶12.  It is also undisputed that, based upon Dee

---

[2] Plaintiff includes with his Opposition his declaration asserting that: "At Mr. Kieler's direction, I went to the administrative building, found the FMLA administrator, and asked her about FMLA leave.  She told me that FMLA would allow me to take time off, but would not change Disney's attendance."  Pietro Decl. (Dkt. 16-3) at ¶13.  However, this statement in Plaintiff's declaration does not show that Plaintiff told Defendant the symptoms of Plaintiff's cancer that required accommodation or how he could be accommodated.  Furthermore, Plaintiff previously testified that he "never raised . . . with anybody from Disney" other than Manager Kieler and Foreman Sanchez "any of the things [Plaintiff] would have liked to have done for [him]."  *See* Pietro Depo. (Dkt. 16-2) at 100:18-24; *see also* Archibald Decl. (Dkt. 18-9) at Ex. 1 (Defendant's Interrogatory No. 9 requesting Plaintiff to "[s]tate the date(s) on which YOU claim to have discussed with someone at Cast Health the fact that YOU had cancer"), Ex. 2 (Plaintiff's response stating that, "[a]ssuming 'discussed' refers to verbal communication, [Plaintiff] does not recall any such discussions with anyone at Cast Health").  To the extent that Plaintiff's declaration attempts to create a genuine issue of material fact by contradicting his own testimony, he can not do this.  See *Kennedy v. Allied Mut. Ins. Co.*, 952 f.2d 262, 266-67 (9th Cir. 1991).

McCaleb's recommendation, Kevin Weiler, the Senior Manager for Plaintiff's department, made the decision to terminate Plaintiff. *Id.* at ¶13. It is also undisputed that Manager Kieler, at the direction of his boss, Kevin Weiler, processed Plaintiff's termination on December 1, 2008. *Id.* at ¶15.

### k.  Plaintiff files the present action

Plaintiff filed a First Amended Complaint ("FAC") on February 17, 2011. *See* Notice of Removal (Dkt. 1) Ex. 1 (FAC). The action was removed to this Court on May 31, 2011. In the FAC, Plaintiff's Second and Third Causes of Action arise from Defendant's alleged "Disability Discrimination and Failure to Provide Reasonable Accommodations" for Plaintiff's "prostate cancer" in violation of California Government Code 12940(a); Plaintiff's First Cause of Action for wrongful termination is based on the same grounds. *See* FAC at ¶¶ 30, 36; Opp'n at 18.

## II.    Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . .

.." *Id.* at 248.  A party cannot create a genuine issue of material fact simply by making assertions in its legal papers.  *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).  Rather, there must be specific, admissible evidence identifying the basis for the dispute.  *Id.*  The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein.  Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).  The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]."  *Liberty Lobby*, 477 U.S. at 252.

## III.  Discussion

Plaintiff's Second and Third Causes of Action arise from Defendant's alleged "Disability Discrimination and Failure to Provide Reasonable Accommodations" for Plaintiff's "prostate cancer" in violation of California Government Code 12940(a); Plaintiff's First Cause of Action for wrongful termination is based on the same grounds.  *See* FAC at ¶¶ 30, 36; Opp'n at 18. Section 12940(a) provides in relevant part that it is "an unlawful employment practice . . . [f]or an employer, because of the "physical disability, . . . [or] medical condition . . . to discharge the person from employment . . . ."  Cal. Gov't Code §12940(a).[3]  Section 12940(a) is part of a larger statutory scheme commonly referred to as the "California Fair Employment and Housing Act (FEHA)."  *See Reid v. Google*, 50 Cal. 4th 512, 519 (2010) (describing "12900 et seq.").

Under California law, employment discrimination is often proved through any of three alternative legal theories: (1) disparate treatment discrimination; (2) disparate impact discrimination; or (3) the failure to make reasonable accommodation where required.  Cal. Bus. Law Deskbook § 14:8 (2011 ed.).  "Disparate treatment" is where the employer engages in "*intentional* discrimination against one or more persons on prohibited grounds."  *Guz v. Bechtel*

---

[3] The parties do not dispute that Plaintiff's prostate cancer constitutes a "physical disability" for purposes of his Second Cause of Action (FAC at ¶ 30) and "medical condition" for purposes of his Third Cause of Action (FAC at ¶ 36).

*Nat. Inc.*, 24 Cal. 4th 317, 354 n. 20 (2000).  In contrast, "disparate impact" is where "a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, *in fact* had a disproportionate adverse effect on members of the protected class.  *Id.*  While Plaintiff never explicitly states which theories he is pursuing, the Court concludes that he is advancing both: (1) a disparate treatment theory; and (2) failure to make reasonable accommodation.  The Court assumes that Plaintiff is pursuing a disparate treatment theory because Plaintiff contends that Defendant's reason for terminating him—namely, Plaintiff's three No Call/No Shows in 12 months—is per se discrimination and because Plaintiff does not suggest that Defendant's No Call/No Show policy adversely affects people with his disability as compared to other workers.  *See Carter v. CB Richard Ellis, Inc.*, 122 Cal. App. 4th 1313, 1324 (2004); Cal. Bus. Law Deskbook § 14:8 (2011 ed.) ("[W]here an employer's policies or practices adversely affect all employees, regardless of their membership in a protected class, plaintiffs would fail to establish a prima facie case of discrimination using a disparate impact theory.").

The Court analyzes Plaintiff's causes of action as follows.  First, the Court concludes that Defendant has shown that Plaintiff can not establish that he suffered an adverse action because of his disability, and thus the Court GRANTS Defendant summary judgment on Plaintiff's Second and Third Causes of Action to the extent these FEHA claims are based on his termination.  Second, the Court concludes that Defendant has shown that Plaintiff can not establish that it was Defendant, rather than Plaintiff, who failed to engage in the interactive process, and thus the Court GRANTS Defendant summary judgment on Plaintiff's Second and Third Cause of Action to the extent these FEHA claims are based on Defendant's purported failure to engage in the interactive process with Plaintiff.  Given that Plaintiff appears to have abandoned the process through which to seek accommodation, the Court also GRANTS Defendant summary judgment on Plaintiff's Second and Third Cause of Action to the extent these FEHA claims are based on Defendant's purported failure to provide accommodation.  Finally, because the Court grants summary judgment on Plaintiff's FEHA claims, the Court GRANTS Defendant summary judgment on Plaintiff's First Cause of Action for wrongful termination.

### a. Plaintiff's Second and Third Causes of Action based on termination

#### i. The Court applies the *McDonnell Douglas* burden-shifting scheme

The parties first dispute whether this Court must apply the *McDonnell Douglas* burden-shifting scheme because, Plaintiff contends, his claims are all established through direct evidence.  Plaintiff is correct that the "*McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  However, Plaintiff is incorrect that his termination for failure to adhere to the No Call/No Show policy is direct evidence of Defendant's disability discrimination because, as discussed in the next subsection, Plaintiff's failure to adhere to that policy was not caused by his disability.  Because the Defendant's termination of Plaintiff was based on Plaintiff's acts unrelated to his disability, Defendant's termination can not be direct evidence.  Because Plaintiff has not presented direct evidence of disability discrimination, the Court will apply the *McDonnell Douglas* test.

"When entertaining motions for summary judgment in employment discrimination cases arising under state law, federal courts sitting in diversity must apply the *McDonnell Douglas* burden-shifting scheme as a federal procedural rule."  *Zeinali v. Raytheon Co.*, 636 F.3d 544, 546 (9th Cir. 2011) (applying *McDonnell Douglas* burden-shifting scheme to analyze summary judgment where plaintiff alleged that defendant "violated the California Fair Employment and Housing Act (FEHA), Cal. Gov't Code § 12940 *et seq.*"); *Dawson v. Entek Int'l*, 630 F.3d 928, 934-35 (9th Cir. 2011) (rejecting plaintiff's argument that prior Ninth Circuit case applying *McDonnell Douglas* burden-shifting scheme to federal claims did "not apply to state law claims" because the prior case held that the *McDonnell Douglas* burden-shifting scheme was a "federal procedural rule" for *Erie* purposes); *see also Shepard v. City of Portland*, 829 F. Supp. 2d 940, 954 (D. Or. 2011) (following *Dawson* and holding that the *McDonnell Douglas* "burden-shifting framework applies to all of plaintiff's employment discrimination and retaliation claims brought under Oregon law").

Under the *McDonnell Douglas* burden-shifting scheme, the employee must first establish a prima facie case of discrimination, which requires her to show "actions taken by the employer

from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a . . . prohibited . . . discriminatory criterion." *Guz*, 24 Cal. 4th at 355 (quotation marks omitted).  The "*McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially." *Guz*, 24 Cal. 4th at 354.

Under the *McDonnell Douglas* test, once plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action.  If the employer satisfies this burden, the employee must show that reason to be pretext by "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Zeinali,* 636 F.3d at 552 (quoting *Dawson v. Entek Int'l,* 630 F.3d 928, 934 (9th Cir. 2011)).  If an employee fails to show pretext, the court may grant summary judgment to the employer.  *See Guz*, 24 Cal. 4th at 357 (affirming grant of summary judgment to employer because employer satisfied its burden to show a legitimate reason for its adverse employment act which plaintiff failed to rebut).

### b.  Defendant has shown that Plaintiff can not establish the third element of his prima facie case under a disparate treatment theory

To establish a prima facie case under a disparate treatment theory of disability discrimination, a plaintiff must show she: (1) "suffered from a disability, or was regarded as suffering from a disability"; (2) "could perform the essential duties of the job with or without reasonable accommodations"; and (3) "was subjected to an adverse employment action because of the disability or perceived disability." *Wills v. Superior Court*, 194 Cal. App. 4th 312, 159-60 (2011); *Green v. State*, 42 Cal. 4th 254, 262, 165 P.3d 118, 123 (2007) ("[I]n order to establish that a defendant employer has discriminated on the basis of disability in violation of the FEHA, the plaintiff employee bears the burden of proving he or she was able to do the job, with or without reasonable accommodation."); *cf. Guz v. Bechtel Nat. Inc.,* 24 Cal. 4th 317, 355 (2000)

(discussing same prima facie test as applied to "disparate treatment" theory of age discrimination claim under FEHA).[4]

Regarding the third element—adverse employment action because of the disability or perceived disability—certain "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *See Humphrey v. Mem'l Hospitals Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir. 2001). "[D]irect evidence" is not necessary to "prove a causal connection between the disability and the adverse employment action"; rather, circumstantial evidence will do. *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 254 (2000).

"At the summary judgment stage," the "requisite degree of proof necessary to establish a *prima facie* case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (holding that plaintiff established "a prima facie [sic] case of disparate treatment under Title VII"); *Abara v. Altec Indus., Inc.*, 838 F. Supp. 2d 995, 1000 (E.D. Cal. 2011) (following *Lyons*).

Defendant appears to dispute whether Plaintiff can establish the third element, that is, that Plaintiff "was subjected to an adverse employment action because of the disability or perceived disability." *Wills v. Superior Court*, 194 Cal. App. 4th 312, 159-60 (2011). Defendant contends that Plaintiff has failed to show that his termination for three "No Call/No Shows" in 2008 was due to his disability because Plaintiff has not shown that his disability caused his failure to provide Defendant notice of his absences prior to the beginning of his 5 a.m. shift. The parties do not dispute that Defendant's true motive in firing Plaintiff was his violation of Defendant's

---

[4] California's disparate treatment theory borrows from federal law because, due to "the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." *Guz*, 24 Cal. 4th at 354; *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1219 (9th Cir. 1998) ("Because California law under the FEHA mirrors federal law under Title VII, federal cases are instructive."); *see also Lyle v. Warner Bros. Television Productions,* 38 Cal. 4th 264, 278 (2006) (discussing race and gender discrimination).

policy against three No Call/No Shows in one 12-month period.  Rather, the parties dispute whether Plaintiff's failure to adhere to Defendant's policy was "because of" Plaintiff's disability.  In short, Plaintiff does not contend that Defendant's firing was pretextual; Plaintiff contends that Defendant's application of its policy to Plaintiff's termination is per se discrimination.

Defendant presents evidence from both Plaintiff's medical file and his own testimony that show that Plaintiff's disability did not prevent him from having either himself or his wife call Defendant prior to the beginning of Plaintiff's 5 a.m. shift.  First, although Plaintiff was diagnosed with cancer either in February or March, 2008 (Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶7), Defendant received from Plaintiff's doctor a "Kaiser Permanente Visit Verification Form" that states that Plaintiff "was seen in this office" on "4/10/08" and that Plaintiff "can return to full duties with no restrictions on 4/14/2008."  Rhoads Decl. (Dkt. 18-6) at ¶2, Ex. 1.

Second, Plaintiff's own testimony shows that his "symptoms did not prevent him from calling WDPR on other occasions when he experienced the same symptoms, and his wife could have called WDPR on his behalf."  Def.'s Stmt Uncontroverted Facts (Dkt. 15-2) at ¶ 25; Pl. Depo. 49:17-50:5, 52:9-12 (Q: "Do you know whether or not in the past your wife has ever made any calls on your behalf to Disney because of you being sick or ill?" A: "I believe yes, she did." . . . Q: "So to the extent that you weren't able to make a phone call for yourself, your wife was certainly capable of making a call on your behalf?" A: "Yes."), 64:23-65:20, 66:3-23, 75:4-24, 78:16-79:8, Ex. 5, 137:25-140:9, 140:12-142:3, Ex. 20.  For example, Plaintiff testified that he was absent on June 25, 26, and 27, of 2008, because he was "sick" with symptoms "[n]auseousness, going to the bathroom, problems going to the bathroom, dizziness."  Pl. Depo. 78:16-79:8.  These were the "same symptoms" that Plaintiff had on November 21, 2008, when Plaintiff failed to call before his 5 a.m. shift to inform Defendant that Plaintiff would not be at work.  Pl. Depo. 78:16-79:8.

Third, Plaintiff's symptoms did not prevent him from moving his head side to side, bending his knees, walking, reading, moving his arms, raising his arms over his head, standing

up, or calling his wife." Def.'s Stmt Uncontroverted Facts (Dkt. 15-2) at ¶ 24; Pl. Depo. 137:25-140:9.

Thus, Defendant has met its burden on summary judgment to show that Plaintiff has failed to establish the third element of his prima facie case under a disparate treatment theory based on his termination.

### i. Plaintiff has failed to create a genuine issue of material fact regarding the third element of his prima facie case

Plaintiff attempts to create a fact dispute as to the extent that his disability caused his failure to call Defendant prior to his 5 a.m. shifts. Plaintiff argues that he was sometimes "so severely ill that he 'wasn't even aware what time it was or what day it was,'" citing his testimony regarding his failure to call Defendant prior to Plaintiff's 5 a.m. shift on July 30, 2008. Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶¶ 24-25. In that testimony, Plaintiff explained that he "start[ed] feeling ill" on July 29, 2008. Sharif Decl. (Dkt. 16-2) at Ex 2 (Pl. Depo. 61:14-17). As of the night of July 29, 2008, Plaintiff "had an understanding" that he "wasn't gonna make it in." *Id.* at 61:23-25. Then, on the morning of July 30, 2008, he still did not feel fine:

Q: "When you woke up that morning –"

Plaintiff: "Yeah."

Q: "-- you didn't feel fine, though?"

Plaintiff: "No, I didn't. I don't even know if I woke up on time. I think I woke up -
- my wife came downstairs, and she said Gary, what are you doing? It's 9:00
o'clock. I wasn't even aware what time it was or what day it was, and she said
You haven't even called in to work. You better call your boss right away. So I
called in, but my shift had already started at 5:00 o'clock in the morning."

Plaintiff's statement that he "woke up" to discover his wife telling him that it was 9 a.m. shows that Plaintiff's failure to call Defendant before 5 a.m. was due to his oversleeping, not to his prostate cancer disability. Thus, Plaintiff has not produced a genuine issue of material fact regarding whether Plaintiff's termination was "because of" his "disability or perceived disability." *See Wills v. Superior Court*, 194 Cal. App. 4th 312, 159-60 (2011).

Plaintiff relies on *Humphrey*, where the Ninth Circuit reversed summary judgment to the employer on a plaintiff's California FEHA claim and federal Americans with Disabilities Act ("ADA") claim because, although the defendant fired plaintiff for "absenteeism," a "jury could reasonably find the requisite causal link between [plaintiff's] disability . . . and [plaintiff's] absenteeism." *Humphrey v. Mem'l Hospitals Ass'n*, 239 F.3d 1128, 1140 (9th Cir. 2001). In *Humphrey*, the defendant's "stated reason for [plaintiff's] termination was absenteeism and tardiness." *Id.* at 1139. Plaintiff introduced evidence that the doctor who "diagnosed her with obsessive compulsive disorder (OCD)" had "sent a letter explaining that diagnosis to [defendant] . . . , telling [defendant] that [plaintiff's] OCD 'is directly contributing to her problems with lateness.'" *Id.* at 1130-31 (quoting doctor's letter). In addition, plaintiff's "psychologist . . . ., like [plaintiff's doctor], diagnosed [plaintiff] with OCD and concluded that it was probable that the OCD caused her absenteeism and tardiness." *Id.* at 1131. Following the rule that "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination," the Ninth Circuit concluded that plaintiff "presented sufficient evidence to create a triable issue of fact as to whether her attendance problems were caused by OCD." *Id.* at 1139-40.

This case is distinguishable from *Humphrey* because Plaintiff has presented no evidence that his disability "caused" his "tardiness" in calling Defendant to provide notice of Plaintiff's three absences before his shifts. *See id.* at 1131. Unlike in *Humphrey*, where plaintiff produced documents from both a doctor and a psychologist attesting to this causal link, here Plaintiff's doctor wrote that Plaintiff "can return to full duties with no restrictions on 4/14/2008." Rhoads Decl. (Dkt. 18-6) at ¶2, Ex. 1.

Thus, Plaintiff has failed to raise a genuine issue of material fact as to this third element.

### ii.  Conclusion

In sum, Defendant has met its burden on summary judgment to show that Plaintiff has failed to establish the third element of his prima facie case under a disparate treatment theory based on his termination. Plaintiff has failed to raise a genuine issue of material fact as to this

third element.  Thus, the Court GRANTS Defendant summary judgment on Plaintiff's Second and Third Cause of Action to the extent they are based on Plaintiff's termination.

### c.  Failure to engage in interactive process or accommodate disability

The FEHA creates two independent causes of action for: (1) "fail[ure] to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations" (Cal. Gov't Code § 12940(n)); and (2) "fail[ure] to make reasonable accommodation for the known physical . . . disability of an . . . employee," unless accommodation would cause the employer an "undue hardship" (Cal. Gov't Code § 12940(m)). *See Wysinger v. Auto. Club of S. California*, 157 Cal. App. 4th 413, 417, 425 (2007) (holding that these two statutory sections "involve separate causes of action and proof of different facts").[5]

Although these two statutory parts create separate causes of action, they relate in that there may be "no failure to provide a required accommodation" under Cal. Gov't Code § 12940(m) "because the parties never reached the stage of deciding which accommodation was required" due to one of the parties having "prevented this from happening by its refusal to engage in the interactive process."  *See Wysinger*, 157 Cal. App. 4th at 425; *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 266 (2000) ("[N]either side has a right to obstruct the process. [Employee-plaintiff] could not legitimately refuse to talk to [employer-defendant's]

---

[5] Cal. Gov't Code § 12940(m) ("For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision or in paragraph (1) or (2) of subdivision (a) shall be construed to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship to its operation."); Cal. Gov't Code § 12940(n) ("For an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.").

personnel who were ready to offer assistance in identifying and locating a suitable position whether or not they had a particular opening in mind."); *see also Jensen*, 85 Cal. App. 4th at 263 ("[A]ssuming the employee is disabled, the employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that . . . the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith").

The Court first addresses Plaintiff's two claims to the extent they are based on Defendant's purported failure to engage in the interactive process and then turns Plaintiff's theory that Defendant failed to provide accommodation.

### i.  Failure to engage in the interactive process

One of the ways that an employer can fail to engage in the interactive process required by FEHA is where: (1) the plaintiff "present[s] the employer . . . with a concise list of restrictions which must be met to accommodate the employee"[6]; (2) upon receipt, the employer fails to initiate at least "an informal, interactive process" with the employee "[t]o determine an appropriate reasonable accommodation."[7]  *See* Cal. Bus. Law Deskbook § 14:11 (2011 ed.) ("[For an FEHA claim based on a failure to engage in the interactive process, the] employee is not required to request any particular accommodation in order to trigger an employer's duty to engage in the interactive process.  He or she must, however, provide the employer at the earliest opportunity with a concise list of restrictions it must meet to accommodate the employee.") (quotation marks omitted).  This interactive process often is an "ongoing," rather than a "single action."  *See Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 821 (2001).

Defendant appears to contend that it "never failed to engage in the interactive process because its obligation to engage was never triggered, given that "Plaintiff never told [Glenn] Kieler ([Plaintiff's] direct supervisor) or anyone else at work, what they could have done to

---

[6] *See Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th at 266.

[7] *See Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 821 (2001).

accommodate him."  Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶23.  Alternatively, Defendant contends that, even if its obligation to engage was triggered, it met those obligations and then "Plaintiff caused the breakdown in the interactive process."  Def.'s Obj. to Pl.'s Evid. (Dkt. 18-2) at 2, 3, 4.

Plaintiff appears to argue that Defendant's obligation to engage in the interactive process was triggered by Plaintiff's statements to Foreman Sanchez about accommodation, given that Plaintiff had previously informed Manager Kieler that Plaintiff had cancer.  Recounted in chronological order, those disputed facts are as follows.

Plaintiff was diagnosed with prostate cancer in either February or March 2008.  Def.'s Reply to Pl.'s Stmt. (Dkt. 18-4) at ¶7.  Plaintiff testified that he told Glenn Kieler that he had cancer "[a]lmost as soon as [Plaintiff] found out" his diagnosis.  *See* Pietro Depo. (Dkt. 16-2) at 33:3-7 (Q: "When did you tell Mr. Kieler that you had cancer?" A: "Almost as soon as I found out.  I needed to take off some time to be operated on, and I told him I was going to need some time off."), 129:12-13 (Q: "And what did you do?" A: "I spoke to Glenn about it.").

Plaintiff testified that "[s]ometime in late June or early July, 2008, I talked to my foreman Carlos Sanchez about my illness, and asked if WDPR could provide any accommodation.'"  Pietro Decl. (Dkt. 16-3) at ¶11; Pietro Depo. (Dkt. 16-2) at 129:1-2 (Q: ". . . your condition with Carlos Sanchez?" A: "That I was sick and needed help.").  In that conversation with Foreman Sanchez, Plaintiff requested "[a]ccommodation for . . . being late or not being able to show up."  Pietro Depo. (Dkt. 16-2) at 129:4-9 (Q: "What type of help?" A: "Accommodation for . . . being late or not being able to show up." Q: "You said that to Carlos?" A: "Yeah.").  In response, Foreman Sanchez told Plaintiff that he "needed to take it up with Glenn [Kieler]."  *Id.*

There is no evidence that Plaintiff followed Foreman Sanchez's instruction for Plaintiff to speak with Kieler until Kieler met with Plaintiff regarding Plaintiff's second No Call/No Show on August 7, 2008.  Plaintiff testified that, in that meeting, he "told" Kieler that Plaintiff "was profus[ely] vomiting, and . . . sick" and "not feeling well."  Pietro Depo. (Dkt. 16-2) at 53:25-54:1.  Kieler "told" Plaintiff that, "if [Plaintiff] needed to take off from work or was not going to be able to make it in, there was a certain form that [Plaintiff] needed to fill out, take to

[Plaintiff's] doctor" and that Plaintiff "could go get that form." *Id.* at 54:6-22.  Plaintiff never told "Kieler about any of the[] things [Plaintiff] would have liked to have done for [him]" as accommodation.  *Id.* at 100:18-24 (Q: "Did you ever talk to Mr. Kieler about any of these things you would have liked to have done for you?" A: "No. No.").

There is no evidence that Plaintiff filled out any such form or followed up with anyone at Defendant regarding this form.  *See id.* at 100:18-24 (Q: "You never raised [any of the things you would have liked to have done for you] with [Kieler]?" A: "No." Q: "You never raised it with anybody from Disney?" A: "No.").  There is no evidence that, after the August 7, 2008, meeting, Plaintiff told anyone at Defendant the symptoms of Plaintiff's cancer that required accommodation or how he could be accommodated.

In sum, even construing the facts in favor of Plaintiff, the Court can only conclude that, with the exception of Foreman Sanchez, Plaintiff did not tell anyone at Defendant the restrictions his disability placed upon him nor request any accommodation by Defendant.  *See id.* at 129:4-9 (Q: "What type of help?" A: "Accommodation for . . . being late or not being able to show up." Q: "You said that to Carlos?" A: "Yeah."); *compare id. with id.* at 100:18-24 (Q: "You never raised [any of the things you would have liked to have done for you] with [Kieler]?" A: "No." Q: "You never raised it with anybody from Disney?" A: "No.").  Once Plaintiff raised the issue with Foreman Sanchez, Foreman Sanchez directed Plaintiff to Manager Kieler.  *Id.* at 129:4-9.  Manager Kieler then informed Plaintiff of the "form" through which he could go about seeking accommodation.  *Id.* at 54:6-22.  There is no evidence that Plaintiff filled out this form and turned it into Defendant after this conversation with Manager Kieler.

The Court concludes that Plaintiff's request to Foreman Sanchez for "[a]ccommodation for . . . being late or not being able to show up," combined with Plaintiff's prior statements to Manager Kieler informing Kieler that Plaintiff had cancer, triggered Defendant's obligation to engage in the interactive process to determine effective reasonable accommodations, as required by Cal. Gov't Code § 12940(n).  However, Defendant did engage in that process when Kieler told Plaintiff about a form Plaintiff could fill out to seek such accommodation.  Plaintiff then ceased engaging Defendant in the process by never telling Defendant the restrictions that

Plaintiff's disability placed on Plaintiff.  *See Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 266 (2000) ("It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee.").  Because Defendant engaged Plaintiff in the process and then Plaintiff ceased engaging Defendant without any discouragement by Defendant or others, Defendant is not liable for failing to engage Plaintiff. *See id.*  ("[N]either side has a right to obstruct the process. [Employee-plaintiff] could not legitimately refuse to talk to [employer-defendant's] personnel who were ready to offer assistance in identifying and locating a suitable position whether or not they had a particular opening in mind.").

At oral argument, Plaintiff expressed concern that the Court was creating a per se rule that the only way in which Plaintiff could engage in the interactive process was via the method chosen by Defendant—in this case, a form filled out by Plaintiff's doctor.  To alleviate that concern, the Court clarifies that it is making no such holding.  Plaintiff could have continued the interactive process through a myriad of ways; for example, if Plaintiff was illiterate, he could have verbally told Defendant about Plaintiff's symptoms and desired accommodations. Alternatively, if Plaintiff felt Defendant's request that Plaintiff fill out a form was too onerous, Plaintiff could have asked his union representative to assist him in communicating with Defendant.  What Plaintiff could not do is utterly fail to respond in any way to Defendant's offer of a process by which to seek accommodation.

Thus, the Court GRANTS Defendant summary judgment on Plaintiff's Second and Third Cause of Action to the extent they are based on Defendant's purported failure to engage in the interactive process with Plaintiff.

### ii.  Failure to accommodate disability

As previously noted, there is "no failure to provide a required accommodation" under Cal. Gov't Code § 12940(m) where "the parties never reach[] the stage of deciding which accommodation was required" due to one of the parties having "prevented this from happening

by its refusal to engage in the interactive process." *See Wysinger*, 157 Cal. App. 4th at 425; *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 266 (2000).

Here, having concluded that Plaintiff ceased engaging Defendant in the interactive process, Plaintiff can not now contend that Defendant failed to accommodate his disability. Thus, the Court GRANTS Defendant summary judgment on Plaintiff's Second and Third Cause of Action to the extent they are based on Defendant's purported failure to accommodate Plaintiff's disability.

### iii.  Conclusion

In sum, Defendant has shown that Plaintiff can not establish that he suffered an adverse action because of his disability, and thus the Court GRANTS Defendant summary judgment on Plaintiff's Second and Third Causes of Action to the extent they are based on his termination. Defendant has shown that Plaintiff can not establish that it was Defendant, rather than Plaintiff, who failed to engage in the interactive process, and thus the Court GRANTS Defendant summary judgment on Plaintiff's Second and Third Cause of Action to the extent they are based on Defendant's purported failure to engage in the interactive process with Plaintiff.  Defendant has also shown that Plaintiff can not establish that Defendant failed to provide accommodation, given that Plaintiff appears to have abandoned the process through which this accommodation could be determined.

Thus, having concluded that none of Plaintiff's theories of FEHA liability are viable, the Court GRANTS Defendant summary judgment on Plaintiff's Second and Third Cause of Action.

### d.  Plaintiff's Wrongful Termination Claim

Plaintiff concedes that his First Cause of Action for wrongful termination "is based on his FEHA claims."  Opp'n at 18.  Thus, having granted summary judgment on Plaintiff's FEHA claims, the Court GRANTS Defendant summary judgment on Plaintiff's First Cause of Action.

///

///

**IV.     Disposition**

      For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment.

      DATED:  October 4, 2012

_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE